The next case this morning is 5-23-0409, Enry matter of McAllister. Arguing for the appellant is Michael Finger. Arguing for the appellee is Jennifer Stewart. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Morning, counsel. Appreciate you being here by Zoom, and I appreciate Courtney arranging to set the Zoom up. Usually, we have more time to set up Zoom, and she had one day's notice this time to set it up, so we extend our appreciation to Courtney. We're also having, as you just may have noticed, the timer issue is coming on and going off, and so we're doing a backup. Appellate attorney Patricia Pfeiffer is doing timing with her phone also, and she'll give you a one-minute warning when it gets to one minute. If the timer does quit, it's good again. Courtney, did you want a minute to try and get that back up and running, or do you want to just go with the phone? No, go forward, because it does not like me. Okay. Mr. Finger, are you ready to proceed? I am, Judge, and I can start a timer on my own phone as well. Okay. You may proceed when you're ready. Your Honor, in this case, we're dealing with a case that often comes before the appellate courts in Illinois, and that is the termination of maintenance, not based on remarriage or the passing of a party, but based on whether parties have cohabitated on a continuing residential and conjugal basis. Judge, in order to refute the trial court's ruling, my obligation is to show that the ruling was against the manifest weight of the evidence. As I cited, too, in my brief, against the manifest weight of the evidence has been defined as being a decision that is unreasonable, arbitrary, or was against the manifest weight of the evidence.  Your Honors, I believe that that is the case here. It's a case that, frankly, is different from many of the cases cited to, and that during the period of time at issue, this country was going through a very strange time. Whether you agree with what happened during COVID or not, it's unrefuted that the alleged cohabitation was occurring during this period of time. The court, it's unrefuted as to the length of time the parties were residing together, Your Honor. That would be from April of 2020 through, I believe, May of 2021. One of the items that Ms. Stewart consistently points to is the length of the period of time the parties resided together. However, as I point out in my reply brief, these parties were residing together for that period of time, from March of 2020 until April of 2021. However, John, who the court did deem to be a credible witness, and that's important to note that John's testimony was deemed to be credible. John himself testified he moved in in March of 2020, and that for about the first month of that time, he was essentially locked away with COVID. And then by September of 2020, he testified that the relationship was, quote, in serious trouble. And then by December of 2020, the relationship had ended. So to say that the parties were living together on a residential conjugal basis is not necessarily true when we have the credible witness testifying that the relationship was in trouble in September of 2020 and terminated by December of 2021. Another key thing to look at was the intended permanence, Your Honor. If the court looks at Bramson, the case cited to in my brief, I think that's the key here. In that case, the parties resided together for a period of about four and a half months. Maintenance was not terminated in that case. What the court noted was that the parties in that case, it was not continuing. And the fact that the parties who resided together testified in Bramson that it was not intended to be permanent led the court to conclude that that was unrebutted. And it led the court to conclude that this was not a continuing cohabitation. Well, counsel, in taking your argument to its logical conclusion, as long as we don't set a wedding date, maintenance never ends, right? That's not the case, Your Honor. I believe had these parties testified that they moved in together and that from the start, they intended it to be permanent and things didn't work out, then, Your Honor, then I would agree this is continuing. It's not necessarily whether a wedding date is set or not, but whether when these parties moved in together, they intended this to be permanent. And the factors you can look at when it comes to whether it was intended to be permanent, for example, would be did they co-mingle their finances and things like that, but that's not present in this case. Both parties, including John, who the court determined to be a credible witness, testified very clearly that this was not intended to be permanent. And what the trial court does is they look at, the court looked at COVID in a way that essentially, when it favored the party who is seeking to terminate maintenance, they said, okay, well, we can consider COVID. For example, one of the things the parties, the courts look at for de facto marriage is do they vacation together? Do they go out to eat together? Things like that. The court arbitrarily says, oh, they didn't travel together because of COVID. There was no evidence whatsoever that there were vacations prior to him moving in before COVID happening. And there was no evidence that attempts to travel were thwarted by COVID. And your honor, both parties, your honors, both parties testified that this was meant to be a temporary arrangement. And I think if the court recalls, the lockdowns were two, three weeks to start with. And John credibly testified that his job is, I believe he sold insurance and was in a financial advisor type position. His office was locked down. He couldn't travel for work. He essentially couldn't work. And that just continued with the lockdowns, your honor. So it's clear the case law isn't, if no wedding date is set, then we're not dealing with terminating maintenance. What the court looks at is- Exclusively from January of 2019 until April of 2021, that they had an intimate sexual relationship beginning in January, 2019, and that he thought Barbara was, he was in love with her and thought she was his forever person. God, I don't agree with what you state about him indicating that he was, she was his forever person. I don't believe either party testified or that there is any evidence that the parties intended to be married, nor is there any evidence that either party intended the cohabitation to be permanent. In fact, the only testimony about whether these parties held themselves out to be a married couple was that, I think John testified that his sons knew they were together but when it comes to things like going to weddings, the only wedding that these parties attended was a mere 15 minutes from my client's home. They traveled separately. My client did not attend the rehearsal dinner and she was in no pictures. She insisted she not be, she didn't think it was appropriate  I will not refute the fact that the parties had a sexual relationship. I will not, but does it rise to the level of a de facto marriage, Your Honor? And it's not just the emotion. I don't think that at trial, the evidence even showed that there was any kind of proof of marriage on, a de facto marriage on an emotional level. Neither of these parties testified that they intended to be married and neither of these parties testified that there was any discussion of such. I just wanna be clear. When you say the parties, I don't think you're talking about Mr. McAllister. I think you're, are you talking about John and Ms. McAllister, correct? Yes, thank you for the clarification, Your Honor. I'm talking about the parties at issue who are at issue with the termination of the maintenance. And again, Your Honor, it's not just the emotional factor. It's also the financial factor. And that's completely lacking here, Your Honor. And if the court looks at the most recent case cited to would be the Edson matter, the part that the court there weighed heavily the issue of financial co-mingling between the new couple, I'll call them. Here, there was two months of rent paid. And at that point, really the co-mingling of finances or any kind of financial interaction didn't exist. There's no joint account. Unless Tim was transferred on death to him. Yes, Your Honor. I'm referring to changing hands of finances and things like that. But when it comes to cases where the estate planning, I'll call it, rose to the level of a de facto marriage, what we had in those cases was things like, those cases involve power of attorneys, they involve wills, they involve life insurance. And I do believe Ms. McAllister testified that, and I can, that this transfer on death on a vehicle was not something that she was used to. But Judge, I acknowledge that doesn't help my case, right? That she did name him as taking over those vehicles if she were to pass. But I also cite to language in my brief that the simple paying of bills or making a loan does not rise to the level of co-mingling as a marital family or as a marital couple would. And Judge, I do not believe that paying two months of rent and then naming a party on a transfer of death on vehicles rises to the level that the parties in cases where maintenance was terminated. I don't believe it rises to that level. In fact, in the Edson matter, there was a refrigerator, I believe, and some washer and dryer bought and extensive work on the house that the male party in the relationship did for the party receiving maintenance. And there was an $800 gift to a wedding for the party receiving maintenance daughter. And the court did not deem that kind of financial support for one another to be rising to the level of a married couple. And when it comes to the gifting and things like that, I think some shirts from Amazon and socks, that's it when it comes to what my client purchased for John and vice versa. John testified he bought a necklace when the parties were still dating before the parties moved in together and they were dating. The only trip these two took was to Indiana. And those are all aspects the courts to look at. I believe what Ms. Stewart is going to argue is these two were living together and these two are having sex. And that is why maintenance should terminate. And Judge, again, the Bramson case, it's an old case from 1980, clearly sets the precedent that just because parties are residing together and having sex relations does not mean that maintenance should be terminated. The intended permanence was the key issue in that case. And I am, I believe, and I think the court will realize upon reviewing the cases I'm sure they have that there is no evidence whatsoever in this case of any kind of intended permanence. What we have is two witnesses who testified, John and my client, that they moved in together not intending it to be permanent. And that because of the COVID lockdowns, this continued and continued. And by December, the relationship was over, if not September. So Judge, I think, your honors, I believe that the intended permanence is lacking. I believe that the financial commingling is lacking when compared to that of a party that is in a de facto marriage. And with that, I'll let Ms. Stewart begin her argument. Thank you, Mr. Finger. Justice Bowie, questions? Not at this time, thank you. Justice McCain, any other questions? No questions. All right, thank you. You'll have rebuttal time in a moment, Mr. Finger. Ms. Stewart, are you ready to proceed? I am. May it please the court, counsel. The appellant has three primary issues with its appeal today. Primarily, the appellant cannot prove that the decision made by the trial court was against the manifest weight of the evidence. Furthermore, the record does not support the appellant's position. And third, the appellant ignores the case law applicable to the facts of this case. First and foremost, I would address counsel's argument with regard to the factual similarities of Bramson. This case is clearly factually distinct from the case at hand. In the Bramson case, you have a ex-wife and husband who in the marital settlement agreement had agreed to a year-on, year-off living situation in the former marital residence for the benefit of their minor children. This was not a situation that was intended to be permanent, and there was evidence of that at the onset. There was no monogamous and no testimony in that case that the parties were in a monogamous relationship and the parties both were dating other people. Furthermore, they had shared expenses, or excuse me, that they each paid for their own expenses. The ex-wife never changed her residential address to the residence of the boyfriend. Unlike the case at hand where John Philbin, the boyfriend of Barbara McAllister, changed his residential address to Barbara McAllister's address, they were in a situation whereby he lived there full-time with his adult son. The parties were in a relationship for in excess of two years. There was absolutely a de facto marriage in the case at hand, and all of the case law is in support of that finding. The Bramson case is not factually distinct, or is not factually similar to the case at hand. With regard to the commingling of financial assets and the intended permanence, I think with regard to the issue of permanence, actions speak louder than words, and that is what Judge Aidy Harlow put in her order. The fact that Barbara McAllister, not once but twice, in July of 2019, and then again in January of 2020, just months before John Philbin, moved into her residence, made him the transfer on death beneficiary for vehicles. Nothing is more indicative of a permanency than someone saying, I anticipate that this relationship's going to last into my death, and I want you to receive this item of property from me when that occurs. The intended permanency is there in the commingling of their lives. If we look at the case law, which is relevant here, one of the things that the court looks at very specifically is the idea of a day-to-day shared existence. This case, Barbara McAllister and John Philbin, they had a day-to-day shared existence. The testimony of John Philbin is that they shared mills, that they shared the responsibility for cooking, that Barbara McAllister bought all of the groceries that she provided for him in the form of buying him T-shirts that had holes in them, that she bought him socks, that she bought gifts for his son, that she provided care for his disabled adult son, Drew, that she and Drew had a very close relationship and that he believed she loved his son, and that they did special activities together like riding golf carts and rock hunting and things of that nature. Clearly, this shows that the parties had a very intermingled life and a shared day-to-day existence. If we look at the other factors that the Heron case presents, it's the length of the relationship. Again, we have a relationship that both parties say is monogamous. Excuse me, when I say parties, I'm referring to John Philbin and Barbara McAllister testified were monogamous beginning in January of 2019. John Philbin did not move out of that residence until April of 21. They began cohabitating in March of 2020 pursuant to the testimony of John Philbin, and the parties engaged in a sexual relationship. There's no doubt about that. How frequently, of course, there was a lot of dispute in the record about that. But this is obviously a committed long-term relationship. And if we look at the cases that I've cited in my brief as to the duration of what the court has found to be a de facto marriage or way in favor of a finding of a de facto marriage as to the duration, this relationship is absolutely on par with a finding of a de facto marriage. If we look at the amount of time spent together, that's one of the big factors that I already kind of explained to the court with regard to that day-to-day shared existence. They spent arguably every day together during the period of cohabitation until John Philbin obtained employment in approximately November of 2020 when he started working from 9 a.m. to 5 p.m. approximately outside of the home. This is all found within the record. There was no testimony presented by Barbara McAllister that she was doing things where John and Drew were not with her. There was no evidence presented of that. The evidence that was presented and the testimony of John Philbin was that they watched TV together frequently, that they shared meals together frequently and generally just spent time together. Again, nature of activities engaged in, that's the next hearing factor. As the trial court stated, the activities engaged in are that of a family, of a familial unit. The fact or the activities were just as I've described, meals, the shared day-to-day existence. The interrelation of personal affairs and finances, I've already touched on that with regard to the vehicles. I think that is incredibly important here and I think that shows the true nature and intention of the parties. But not only that, they spent time with each other's families. What the appellant fails to point out here or fails to recognize is that prior to COVID, the testimony is that the parties went on dates regularly, that they regularly went out to eat in that restaurants and that they did spend time with each other's families, specifically a trip to Indy to visit Barbara McAllister's adult son, Robert and his child was having a birthday. They spent the night in a hotel room together. There was no testimony with regard to the vacations that either party took a vacation without the other. If we look to the Sunday case, the appellate court found that the trial court properly gave little weight to the issue of taking vacations where no evidence of either party going on a vacation during that relevant period of time was presented. Similarly here, there's no evidence that either party went on a vacation individually, let alone together. Now that's exactly what the trial court was saying in its written order. The court didn't give a lot of weight to that issue and this court shouldn't either. And I think we have to look at this through the lens of COVID. There were restrictions. There are things that did not occur. But we look at the testimony of the parties. The testimony of the parties is that they didn't do these things not because they didn't want to, but because either there was no money. And when I say parties, again, I'm sorry, I'm referring to John Philbin and Barbara McAllister, that John didn't have the money to go on a vacation and that they didn't go out to eat because they couldn't because of the COVID lockdowns. It wasn't because they didn't want to or it wasn't something that they did frequently as a part of their relationship. The evidence is clear. When we look at the totality of the circumstances and the written order of Judge Adie Harlow truly considers that totality of the circumstances. Where the Heron factors are six, Judge Harlow includes two additional factors and she looks at the intended permanence. And she also looks at the idea of the recipient spouse as the effect of the relationship on maintenance. And if we look at the Sappington case, the Supreme Court specifically looked at the consideration of whether the recipient spouse used maintenance monies to support the co-resident. The undisputed testimony that was presented during trial is that Barbara McAllister absolutely used her maintenance monies and her social security money, which were her only two forms of income to support John Philbin and his son Drew while they lived with her. Paid for everything. John has never paid her rent, has never provided for groceries, has never paid any kind of utility bills during that period of time that he resided with Barbara. And at the time of trial, the parties had already broken up but he testified he'd never paid her back anything. I think it's very clear here that this is a de facto marriage. One of the points that council makes is with regard to duration. And I would point out that one of the arguments Robert McAllister made was that the language of the parties marital settlement agreement modifies that statutory language to just include cohabitation on a conjugal basis. The continuing and resident part of that has been removed. Judge Aidy Harlow opines on that in her written order. This issue was not appealed by the appellant. So arguably, despite the fact that the court did find a de facto marriage existed, the parties intended for the termination of maintenance to be even easier for the court to grant with that modification of the language. For all of the reasons that I've stated, I believe that a de facto marriage has clearly existed between John Feldman and Barbara McAllister that the court's finding is obviously not against the manifest way of the evidence that the court did properly consider all of the case law, all of the statutory language and the modified language of the marital settlement agreement and made the proper determination and finding based on the evidence. Thank you. Thank you, Ms. Stewart. Other questions, Justice Bowie? No, thank you. Justice McKinney? No questions. All right, thank you. Thank you. Mr. Fanger-Ribaudel? Yes, Your Honor. The argument being made by the opposing party continues to be that of they were residing together and therefore, because they were residing together and because they had a sexual relationship, that meets the standard to terminate maintenance. The opposing party- I don't mean to cut you off, Mr. Fanger, but doesn't that go exactly to Ms. Stewart's kind of her last argument that the marital settlement agreement basically talks about the wife's cohabitation, if I wrote it correctly, on a conjugal basis? Well, I would argue that or feel I needed to argue that if she had raised that issue in the appeal. Okay. And she did not. Today at oral argument is the first time she's made this argument about the language in the marital settlement agreement. So I don't believe it would be appropriate to consider that argument in the ruling of the court. Furthermore, conjugal still being the key issue. And Judge, when it comes to conjugal, it's not just the parties residing together. Again, the court seems to really focus on these six factors, but as was mentioned in the Edson case, the 2023 case, that is not a be-all, end-all. And the court doesn't seem to focus on the three factors that need to be met in the statute, which is resident, continuing, and conjugal basis. And Judge, it is unrefuted that these parties did not intend to reside together on a continuing basis or permanent basis. That is completely analogous to the 1980 case I cited to, I believe it was Branson. Yeah, the Branson matter. Counsel, you say it's unrefuted, well, what about the leaving the car on death? Judge, I don't believe that that rises to the level of, is that indicative of a committed dating relationship or is it indicative of a de facto marriage, Your Honor? And my position is that just the simple fact that a party signed someone onto a title as a transfer on death, that doesn't rise from the level of an intimate dating relationship to the level of a de facto marriage where both parties testified, parties being the dating couple, that neither of them intended to reside together on a permanent basis and neither of them intended to get married. Well, to follow up on Justice McHaney, and I hate to sound somewhat cynical, but the party who is testifying that they did not intend to cohabitate or be permanent is trying to keep the maintenance checks from coming when that same party did two vehicles transfer on death, which I'm gonna be flat honest, it's a stretch to say that someone would do that just for someone they may be dating. Judge, I'm not, I'm focusing on and I have been focusing on John's testimony as well. I understand. And John's testimony was that it was not intended to be permanent residing together. And the cases that both parties have cited to in this case, there's a greater level of co-mingling of finances than we have here. In a lot of these cases, we've got parties traveling across the country together on a regular basis, throwing birthday parties for one another, large gifts to a daughter's wedding in the amount of $800 in the Edson matter. I do not feel that the simple fact that a transfer on death on a title rises to the level of a de facto marriage and an honor. John had no money. The testimony is all he had no assets. He had no money. He had maybe 9,000 in an IRA of some sort. He didn't have to tap into it because he was living rent free with Mrs. McAllister. She's providing the groceries. She's providing the deodorant and the shampoo and the conditioner. She's got his son living with him. She's adding his name to cars. I mean, there wasn't co-mingling because they didn't have to co-mingle. She's buying everything for him. So he's got nothing to co-mingle. So, I mean, it seems to me like to the extent that could, she was giving him everything. So I'm not sure I follow your argument that. If I could respond despite the time being up. A review of the Edson matter clearly shows that it sounds like from the court that the key issues here are the financial aspects of the title and the fact that she is supporting, was supporting his minimal day-to-day needs to exist at his home. But in the Edson case, the parties kept their separate addresses. They didn't abandon their residences. In this case, he gave up his apartment. He moved in with Mrs. McAllister. So Edson seems distinguishable to me. Judge, that's true. But even in cases such as the 1980 case I cite to where the parties are residing together, that is not enough to terminate maintenance. And again, the Edson case clearly states that the simple fact that the parties, one party might pay a bill or make a purchase for the other is not sufficient to terminate maintenance. And just like the Edson case, these two could separate and walk their separate ways and it's not an issue. Judge, there was no will that had to be modified. There was no joint accounts that had to be separated. We had a title for two vehicles with the transfer on death on it that Mrs. McAllister testified. Had it been in Illinois, she wouldn't have even done it because it doesn't exist in Illinois. And with that, I'll rest. All right, thank you. Other questions, Justice Bowie? No, thank you. Justice McKinney? No questions. All right, thank you. We appreciate your arguments. We've read your briefs. We'll take the matter under advisement, issue a decision in due course.